ON APPLICATION FOR REHEARING
The original opinion in this case is withdrawn and the following opinion is substituted in its place.
Three questions are presented by these appeals.
(1) Does a court of equity have power to authorize a guardian of a person of unsound mind to sell privately the ward's real estate?
(2) Did the actions of the guardian of persons of unsound mind constitute "self-dealing" when she sold the property of her wards to her own children?
(3) Did the trial court err in finding that the children born to a person adjudged insane were his "heirs at law?" *Page 768 
We answer questions 1 and 2 in the affirmative. As to issue 3, we find that the trial court did not err and we affirm the judgment of the trial court as to that matter.
As the appellants state in brief: "The facts in this case read like a great American epic." The land involved was originally owned by Clark Cross. When he died in 1907, his real estate was divided into four parcels consisting of over 600 acres each. One parcel was distributed to each of his four children: Charles Macklyn Cross (C.M. Cross), William Clark Cross (W.C. Cross), John B. Cross, and Eliza Marvin Rudder (E.M. Rudder). John Cross sold his acreage shortly after it was distributed to him. E.M. Rudder held her share until her death.
C.M. Cross and W.C. Cross were declared non compos mentis several years after their father's death. Their sister, E.M. Rudder, served as their guardian until their deaths. She managed the three contiguous tracts which belonged to her and to her wards as a single family farm. She made periodic settlements of the wards' estate and filed them with the court.
Both wards married, but the marriages were annulled shortly afterward by their sister, the guardian of both. W.C. Cross left no lineal descendants. C.M. Cross allegedly maintained a common-law marital relationship with one Annie Bell Daniels, and left five children.[1]
Between 1957 and 1961, the guardian sold all the realty then belonging to her wards in a series of private transactions between her and her children. A portion of the realty was shortly afterward transferred back to the guardian in her individual capacity. Although various amounts of consideration for these transfers were involved, it appears from the record the average price paid per acre was less than twenty dollars. These private sales were confirmed by the Circuit Court of Jackson County, sitting in equity. The wards were never informed of the sales, but a guardian ad litem was appointed by the court. All deeds were recorded.
W.C. Cross died in 1963. C.M. Cross died in 1966. The guardian made a final settlement of the W.C. Cross estate. The C.M. Cross estate has never been settled and is still pending in the Jackson County Circuit Court.
This case was commenced in 1968, in the Circuit Court of Jackson County, Equity Division, by the heirs at law of the late John Cross. They petitioned for a rescission of the deeds made by the guardian and distribution of the subject lands to the heirs *Page 769 
at law of the wards. They further petitioned the court to find the alleged children of C.M. Cross to be illegitimate and unable to take as heirs at law. Named as defendants were E.M. Rudder, her children and the purported children of C.M. Cross. The children of C.M. Cross cross-claimed contending they were not illegitimate as they were the offspring of the common-law marriage of C.M. Cross and their mother and were entitled to take their shares of the subject lands as heirs at law of the wards. They further contend that to deny them their share because they are illegitimate would deprive them of equal protection of the law.
All testimony was taken by depositions and no evidence was taken orally.
After ten years and one month of proceedings the last specially appointed judge, Honorable William D. Page, entered an order declaring cross plaintiffs to be heirs of the wards, but refused to rescind the deeds and denied any other relief to any party. Plaintiffs and cross plaintiffs appealed, claiming the court erred in denying them relief. Defendants appealed from the determination that the cross plaintiffs are the heirs at law of C.M. Cross.
 I. RIGHT OF GUARDIAN TO SELL REAL ESTATE AT A PRIVATE SALE
On original deliverance, a majority of the Court was of the opinion that an equity court was without authority to authorize the private sale of an insane person's property. In reaching that conclusion, the majority opined:
"The requisites of a valid sale of a ward's realty were clearly set forth in Wilson v. McKleroy, 206 Ala. 342,89 So. 584 (1921), wherein the Court held:
 `The legal title to land of a minor is not in his guardian, but in the ward. It cannot be sold by the guardian except by an order of a court. The court is the vendor. No title passes from the minor until the sale is confirmed by the court. The duty of the court is to secure the best price, full value of the property, for the interested party or parties. Montgomery v. Perryman, 147 Ala. 207, 41 So. 838, 119 Am.St.Rep. 61; Roy v. Roy, 159 Ala. 555, 48 So. 793.
 `The guardian of a minor has no right to sell privately her ward's real estate. . . .
 `When a necessity exists to sell the real estate of a ward for maintenance, division, to pay debts or reinvestment, the order may be obtained from a court of competent jurisdiction, there must be a public sale, the sale reported to the court, the report confirmed, the purchase money paid, and deed directed to be made by the court to the purchaser. In this way a valid title to real estate of a ward may pass to the purchaser. Sections 4411, 4409, 4426, Code 1907; Am. Eng.Enc. of Law, vol. 15, p. 57; Le Roy v. Jacobosky, 136 N.C. 443, 48 S.E. 796, 67 L.R.A. 977'
(Emphasis added.)
"Appellees (cross appellants) contend that the Circuit Court of Jackson County, sitting in equity, had jurisdiction to approve a private or a public sale of the wards' land. They cite Montgomery v. Montgomery, 236 Ala. 33, 180 So. 709 (1938), as authority for this principle. In Montgomery, this Court held, irrespective of statutory law, `the chancery court possesses the power to authorize the guardian of a non compos mentis to sell or mortgage the real and personal property of the ward, whenever it becomes necessary to pay the debts of the estate, or to provide necessary maintenance and support for the non compos mentis, and of his family.' The Montgomery case does not address whether the power to sell includes the power to sell at a private sale. We recognize that in Montgomery, the equity court had authorized a private conveyance. If Montgomery
advances the proposition that equity has jurisdiction to order a private sale of a lunatic's estate, it is inconsistent with the statement in Wilson v. McKleroy, that `there must be a public sale.' Wilson's requirement of `a public sale' is consistent with § 26-4-144, and its predecessors, which required such sales to be at `public outcry.'" *Page 770 
The Court further opined that "[i]n view of the fact that the legislature has set up a statutory scheme whereby a sale of an insane person's estate can be effected, a court of equity is without inherent power to deal with the estate in a manner inconsistent with the statutory scheme. This is what we understand Roy [Roy v. Roy, 159 Ala. 555, 48 So. 793 (1909)] holds, and we think the holding in Roy is consistent with equity jurisprudence, because equity `. . . jurisdiction over the person and property of lunatics and idiots, and all others who may be adjudicated non compos mentis, was derived by delegation from the crown; it was a portion of the king's executive power as parens patriae, and did not belong to the court of chancery by virtue of its inherent and general judicial functions. This branch of the regal authority was delegated to the chancellor as the personal representative of the crown, by means of an official instrument called the Sign Manual, signed by the king's own signature, and sealed with his own privy seal, and was exercised by the chancellor alone, and not by the court of chancery.` Pomeroy's Equity Jurisprudence, Vol. 4, 5th ed. § 1311, p. 883 (1941)."
On rehearing, we have been favored with additional briefs by the parties and several briefs by amici curiae. The thrust of the briefs which urge rehearing on this particular issue are to the effect that the statement in Wilson v. McKleroy, which the majority used in the original opinion, is not the law. Typical of the arguments is one made in an amicus curiae brief, which reads as follows:
 "Wilson v. McKleroy, supra is in direct conflict with the opening statement in the earlier case of McCreary v. Billing, 176 Ala. 314, 315, 58 So. 311
(1912):
 "`It has long been the settled doctrine in this state that it is within the original jurisdiction of courts of equity to decree the sales of lands of infants, not only for their maintenance and education, or to remove incumbrances, or to satisfy charges resting thereon, but for the investment of the proceeds of sale for the general interest and advantage of the infant. Ex parte Jewett, 16 Ala. 409; Rivers v. Durr, 46 Ala. 418; Goodman v. Winter, 64 Ala. 410, 38 Am.Rep. 13; Thorington v. Thorington, 82 Ala. 489, 1 So. 716.' [Emphasis provided in brief.]
* * * * * *
 "`It is also the rule in this jurisdiction that, when it is manifestly for the benefit of an infant, courts of equity will permit trustees and guardians to change the character of his property; and if, without the authority of the court, the change is made the court will sanction and confirm it, if, under the circumstances, it would have decreed the change. Goodman v. Winter, supra. * * *' [Emphasis provided in brief.]
* * * * * *
 "The majority opinion quotes from Pomeroy's Equity Jurisprudence, 5th Ed. (1941). . . . We will . . . illustrate that the English rule on this subject, which Pomeroy states, has never been the law in Alabama.
 "Now we quote . . . from Pomeroy's 4th Ed. Section 1309, Pages 3148-9 (1916):
 "`* * * It seems to be a doctrine sustained by a preponderance of authority, that a Court of Equity has no power, as a part of its jurisdiction over infants, to order a sale of the infant's real estate for purpose of maintenance, education, or investment. * * *'
 "Seemingly this would support the statement in Wilson v. McKleroy, supra, upon which the majority relies and the opinion of the majority that a public auction must be had. However, in footnote (f) to this section at Page 3150 Pomeroy notes that Alabama holds to the contrary."
An argument made in one brief is: (1) that Wilson v. McKleroy
is not sound law, (2) that Roy v. Roy was a "digression" which "was rectified by the Act of 1911 as applied in Dent v. Foy,206 Ala. 454, 90 So. 317," and (3) that the statement quoted from Pomeroy by the majority in the original opinion should not be followed, because *Page 771 
Alabama has specifically refused to follow that principle.
As can be readily seen, the brief writers, as did the Chief Justice and three Justices who concurred in the original opinion, recognized that Wilson v. McKleroy states specifically that ". . . there must be a public sale." (Emphasis added.) The applicants for rehearing and amici curiae, argue that Wilson v.McKleroy should not be followed. Typical of the arguments in this case is this one:
 "We cannot believe that Wilson v. McKleroy, supra, overrules these authorities [McCreary v. Billing, 176 Ala. 314, 58 So. 311 (1912), and Thorington v. Thorington, 82 Ala. 489, 1 So. 716 (1887)], and is the absolute final word for the proposition that in sales of the property of a minor or lunatic, there must be a public auction. To give Wilson v. McKleroy
the effect which the majority opinion gives it, is to ignore these earlier decisions leading to a different result as well as the later case of Montgomery v. Montgomery, 236 Ala. 33, 180 So. 709 (1938) which as the minority opinion points out so clearly, is inconsistent with the view of the majority."
We wish to point out that on original deliverance, the majority was quite aware that the Court in Montgomery v.Perryman, 147 Ala. 207, 41 So. 838 (1906), which dealt with alunatic's estate, in talking about a court sale, opined: "This is true, whether the sale is public or private." We then noted that Montgomery v. Perryman was cited in Wilson v. McKleroy, which the majority followed.
The majority, on original deliverance, was also aware that inMontgomery v. Montgomery, 236 Ala. 33, 180 So. 709 (1938), the sale was a private sale. In view of these facts, these questions were presented: Did Montgomery v. Montgomery overruleWilson v. McKleroy? Was Wilson v. McKleroy inconsistent withMontgomery v. Perryman, a case cited therein? Has Alabama not followed the common-law rule, as set out by Pomeroy, when dealing with the estates of lunatics, as it apparently has in the case of infants? Did Title 13, Section 138,[2] which allows the circuit court to "proceed according to its own rules and practice" authorize the circuit court to order a private sale— that is, was the rule and practice of circuit courts, in 1911, when Title 13, § 138 was first adopted, to allow equity courts to order a private sale of a lunatic's estate? The majority, on original deliverance, was faced with obviously inconsistent prior decisions of this Court. The majority, therefore, followed the clear statement in Wilson v. McKleroy
that there must be a public sale, especially since that comported with the statutory scheme required in probate court.
After further study and reflection, and in view of the effect that the original opinion would have upon land titles, not only those involving estates of lunatics, but possibly also involving infants (although the case here does not involve infants), we are changing our opinion on the requirement that the sale of a lunatic's real property must be by public outcry when the proceeding has been removed to circuit court.
We are now persuaded that Montgomery v. Montgomery, 236 Ala. 33,180 So. 709 (1938), indirectly, at least, modified or overruled the statement in Wilson v. McKleroy that there must
be a public sale of a ward's property. In view of this, we now state what we consider to be the power of an equity court to order a sale of a lunatic's estate under prior and current law:
The usual method of disposing of a lunatic's real estate is by a public sale thereof, but in certain cases where the interests of the lunatic would be advanced, the sale may be a private one.
Although we now hold that an equity court is not bound by the statutory procedure which requires that a sale of a lunatic's property by the probate court be "at *Page 772 
public outcry," (Code 1975, § 26-4-144), we call attention to this statement of public policy by the Legislature which restates the common-law rule that the usual method of disposing of a lunatic's real estate is by a court-ordered public sale.
In probate court, it is the sole method; in circuit court, it should be the usual method. It is only when the interests of the ward would be benefited that a private sale should be authorized. In no case should a court authorize a private sale without determining that it is in the best interest of the ward to do so.
Justice McClellan, dissenting in Roy v. Roy, 159 Ala. 555,48 So. 793 (1909), first thought that equity could not order a private sale, but changed his mind; nevertheless, he still thought a private sale should be "rare." He opined:
 "Authority to effect the sale in question by private contract was sought and granted. The writer was at first inclined to the view that no such power could be exercised by the court, and this independent of the statute requiring, in sales by the probate court, that such sales be at public outcry. Fuller consideration has led me to the contrary conclusion. The practice of courts of equity to direct such sales by private contract seems to be well established, and so upon the idea that the manner of sale is a matter reposed in the sound discretion of that court. Dan Ch. Prac. p. 1293 and authorities there noted; Cox v. Price ([2] Va. [Dev. 170]) 22 S.E. 512. The court is the vendor, and its primary object is to obtain for the property, in the interest of those entitled to the proceeds, full value. This may be best accomplished by private contract, though such occasions must needs be rare. But, whether the sale be at public outcry, after due publicity, or by private contract, title thereunder does not pass until confirmation thereof by the court and the action of the court in that important particular would not be taken until fair opportunity is given parties in interest to resist, if so desired, the confirmation upon the ground among others of inadequacy of price, or, it may be, by such showing as would reasonably induce the court to conclude that a better and fairer price would be obtained by a sale at public outcry." (Emphasis added.)
The statement in Wilson v. McKleroy that there must be a public sale should no longer be followed.
 II. SELF-DEALING
Plaintiffs and cross plaintiffs below urge upon us that the decision of the trial court should be reversed on the ground that the guardian was in a fiduciary relationship with the wards and that the subject transactions constituted self-dealing. We agree.
In Calloway v. Gilmer, 36 Ala. 354 (1860), this Court held ". . . that a purchase by a trustee, for his own benefit at a sale of the trust property, is voidable at the option of the cestuique trust, and will be set aside, if application for that purpose be made in a reasonable time; and it makes no difference in the application of the rule, whether the purchase be direct or indirect, in person, or through an agent, or by the medium of a person who subsequently reconveys to the trustee." This longstanding rule of law was again recognized by implication in Craig v. Craig, 372 So.2d 16 (Ala. 1979).
In Craig, supra, this Court held a limited exception to the rules against self-dealing exists which permits an executor to purchase only at a public sale of the property. That exception is not available in the instant case because all sales of the wards' land were at private sales, even though with court approval.
In each instance the private sale by the guardian was made to her own children (who paid roughly $20 per acre). A short time after the sales were approved, a large portion of the land was given back to the guardian, in her individual capacity. In one instance, when the guardian was asking the court to approve a private sale, she increased the sales price without even consulting the proposed buyer. It is readily apparent that, in this case, the fiduciary relationship between the guardian and her wards was breached. We find that the trial *Page 773 
court should have rescinded the deeds because of the guardian's self-dealing.
 III. LACHES
The appellees contend the claims herein are barred under the defense of laches. "In James v. James, [55 Ala. 525 (1876)], it was stated that knowledge of facts entitling one to relief and lack of diligence in enforcing those rights must coexist in order for laches to bar a claim." Craig v. Craig, supra. Craig
further notes that mere recordation of the deed does not impute knowledge of the transaction to one who has no duty to search for such a deed. We find the instant case was timely filed after discovery of the actions of the guardian by the heirs of the wards, with no prejudice resulting to the appellees.
Other arguments presented as to the timeliness of this action are without merit.
 IV. CROSS-APPEAL
The heirs of the guardian and the late John B. Cross appeal from the judgment entered by the trial court finding that the children of C.M. Cross were his "heirs at law." As previously indicated, the testimony in this case was taken by deposition and was not heard ore tenus by the trial court; consequently, it is this Court's duty to weigh and consider the evidence de novo and arrive at a conclusion without the aid of any presumption in favor of the trial court's findings of facts.Murphree v. Smith, 291 Ala. 20, 277 So.2d 327 (1973).
We have reviewed the record and we affirm the findings made by the trial court that the cross plaintiffs were the "heirs at law" of C.M. Cross. Sufficient testimony shows that it was the intent of C.M. Cross and Annie Bell Daniels to enter into a common-law marriage. At the birth of each child, "C.M. Cross" was duly recorded as its father. The children bore the name "Cross" and were generally reputed in the community to be the children of C.M. Cross. Testimony was admitted that indicated C.M. Cross spent as much time as he could with the family. He relied on the advice of a local lawyer that he had a common-law marriage with the mother of his children. The children believed C.M. Cross to be their father and he treated them as such.
A common-law marriage having been shown, the law presumes its validity, and casts the burden upon him who questions it to establish its invalidity. Sloss-Sheffield Steel Iron Co. v.Alexander, 241 Ala. 476, 3 So.2d 46 (1941). The cross appellants contend that they met this burden primarily by showing the prior adjudication of insanity of C.M. Cross. They also claim that other elements necessary to a common-law marriage were not present.
Here, we have two legal presumptions which clash: (1) a presumption that a person adjudged insane continues to be insane until his sanity is established, and (2) the presumption that a marriage is legal and valid, especially when children are born as a result of that relationship. Insofar as Alabama is concerned, this situation has not heretofore presented itself, but an almost identical situation occurred in Indiana in 1932, when a wife, after an annulment because of her husband's adjudicated insanity, continued to live with her non compos husband until his death, when she sought part of his estate as his wife. The Indiana Supreme Court stated:
 "While it is true that after a person is once adjudged insane, or the fact of one's insanity is established, there arises a presumption that such condition continues till the contrary is shown, and until his sanity is established, and such person would during such time be incompetent to effect a valid marriage or to enter into any other valid contract whatsoever, such is the rule where the question involved relates to ordinary business transactions in which the public has no interest. Redden v. Baker (1882) 86 Ind. 191. But where the legality of a marriage is involved, as in this case, we are confronted with another presumption, viz., the presumption of the legality of the marriage relation. The question therefore is: Which is the stronger presumption, that *Page 774 
of continued insanity of William Langdon for a period of almost five and one-half years, and consequent adultery, or that of restoration of sanity and legitimate cohabitation? If we presume that William Langdon regained his sanity before his death, and continued to live and cohabit with Grace Langdon as husband and wife, being accepted in society as such, the law will presume a good common-law marriage; the presumption being in favor of morality and not immorality, legitimacy and not bastardy. Boulden v. McIntire (1889), 119 Ind. 574, 21 N.E. 445, 12 Am.St.Rep. 453; Castor v. Davis (1889), 120 Ind. 231, 22 N.E. 110, 111.
 "`Every intendment of the law is in favor of matrimony. When marriage has been shown in evidence, whether regular or irregular, and whatever the form of the proof, the law raises a strong presumption of its legality; not only casting the burden of proof on the party objecting, but requiring him throughout, and in every particular, plainly to make the fact appear, against the constant pressure of this presumption that it is illegal and void. So that it can not be tried like ordinary questions of fact, which are independent of this sort of presumption.' Bishop on M. D. Vol. 1 (6th Ed.) § 457." Langdon v. Langdon, 204 Ind. 321, 183 N.E. 400
(1932).
Although no longer applicable in Indiana because of that state's abolishment of the common-law marriage, we think the reasoning in the Langdon case is sound. We adopt it.
We affirm the trial court's finding that the cross plaintiffs were "the heirs at law" of C.M. Cross. We deem it unnecessary to discuss whether the cross plaintiffs may have had right of inheritance as illegitimates. Cf. Everage v. Gibson,372 So.2d 829 (Ala. 1979).
The judgment appealed from is therefore due to be affirmed, in part, reversed, in part, and remanded for further proceedings consistent with this opinion.
AFFIRMED, IN PART; REVERSED, IN PART; AND REMANDED. APPLICATION FOR REHEARING OVERRULED AND OPINION SUBSTITUTED.
All the Justices concur.
[1] The status of the parties and their relationships are, as follows:
 CLARK CROSS (DIED 1907)
 CHARLES MACKLYN CROSS
(NCM — 1915) (DIED — 1966) HEIRS — CROSS PLAINTIFFS:
 1. Florence Cross Curtis 2. Martha Jane McGee 3. James William Cross 4. Dean Marvin Cross 5. Sadie Cross Bias
 JOHN CROSS
(DIED — 1960) HEIRS — PLAINTIFFS:
 1. Mazie Green 2. Ruby Housley 3. Johnie Abney 4. Robert Cross 5. James Cross 6. Frank Cross (Died '77)
 (a) Judy Cross Ingram (b) Lynn Cross McCrary
 WILLIAM CLARK CROSS
(NCM — 1907) (DIED — 1963) HEIRS — CROSS PLAINTIFFS, PLAINTIFFS, AND DEFENDANTS SINCE NO LINEAL DESCENDANTS.
 ELIZA MARVIN RUDDER
(GUARDIAN) (DIED — 1973) HEIRS — DEFENDANTS:
 1. James M. Rudder 2. Robert Clark Rudder 3. Ruth Timberlake
[2] Now Code 1975, § 12-11-40, but note that the words "may, in its discretion, proceed according to its own rules and practice" in the 1940 Code were changed to read "shall proceed according to the Alabama Rules of Civil Procedure" in the 1975 Code.