On Application for Rehearing

PER CURIAM.
The opinion of June 18, 2010, is withdrawn, and the following is substituted therefor.
The Alabama Department of Corrections (“the department”); Richard Allen, commissioner of the Department of Corrections; Governor Bob Riley; Mr. Carter,[1] director of the Mobile Work Release Center; and Mr. Reynolds,[2] director of the Loxley Work Release Center (hereinafter referred to collectively as “DOC”), appeal from the judgment determining that DOC violated the department’s regulations by overcharging work-release inmates for transportation costs and by misinterpreting State law by withholding more money from the gross pay of inmates’ work-release earnings than it was authorized to do under State law. Jerry Mack Merritt, Thomas Layton, Johnny Walker, Warren R. Robinson, and Darrell Williams[3] (hereinafter referred to collectively as “the plaintiffs”), inmates or former inmates in the custody of the department who participated in a work-release program, cross-appeal from the trial court’s judgment determining that DOC was authorized to charge work-release inmates for certain goods or services and to charge all inmates a fee for self-initiated medical care and a fee for drug testing conducted by entities other than the department.
The record indicates the following. The department is authorized to operate a work-release program for inmates. Pursuant to that program, inmates are permitted “to leave the confínes [of their places of incarceration] unaccompanied by a custodial agent for a prescribed period of time to work at paid employment.” § 14-8-2(a), Ala.Code 1975. Work-release inmates are confined in their respective prisons during the hours they are not at work. § 14-8-2(a). Inmates who are qualified to take part in the program have the option of whether to participate.
Since 1992, § 14-8-6, Ala.Code 1975, has authorized the department to withhold up to 40% of an inmate’s work-release earnings for costs “incident to the inmate’s confinement.” Before 1992, § 14-8-6 provided that the maximum amount of earnings the department was allowed to withhold from an inmate’s work-release earnings was 32.5% of those earnings. The record includes a copy of Admin. Reg. No. 410, promulgated by the department, which, in § VII.B., provides that, “[a]s authorized by statute, thirty-two and one-half percent (32}⅛%) of work releasees’ gross earnings will be deducted by the Department of Corrections to assist in defraying the cost of his/her incarceration.” (Emphasis in original.) Richard Allen, the commissioner of the department, testified by deposition that, after § 14-8-6 was amended to allow the department to withhold up to 40% of an inmate’s work-re *7 lease earnings, the department’s policy was to withhold up to 40%, rather than up to 32.5%, of an inmate’s work-release earnings even though Admin. Reg. No. 410, § VII.B., had not been formally amended. However, that unwritten policy has been ratified by the commissioner. The copy of Admin. Reg. No. 410 submitted into evidence is dated 1997, and it includes a handwritten notation at § VII.B. stating: “Changed to 40%, see 14-8-6.”[4] The balance of a work-release inmate’s earnings is deposited into his prison account.
Administrative Regulation No. 410 also authorizes the department to charge inmates participating in the work-release program for the cost of transportation to and from their places of employment.[5] Pursuant to Admin. Reg. No. 410, § VII.B., inmates using transportation provided by the department to and from their work-release jobs may be assessed $2 for a one-way trip and $4 for a round trip. At the time of trial, however, inmates were being charged transportation costs of $2.50 for a one-way trip and $5 for a round trip.
The department also charges work-release inmates a laundry fee for cleaning the “free-world” clothes they wear to their work-release jobs. There is no charge for laundry services for prison-issued clothing. One of the plaintiffs, Merritt, complained of having to pay $16 a month for laundry services while he was at the Loxley and Mobile work-release centers. He also complained about having to use a coin-operated laundry while at the Mobile work-release center after September 2005, because, he said, “minimum custody laundry was free.”
Merritt and Walker also testified that they had to purchase their own toiletries while participating in the work-release program. Those purchases must be made in addition to the money the department withholds from work-release inmates’ earnings to defray the costs of the inmates’ confinement. The plaintiffs testified that, when they were incarcerated in prisons, as opposed to work-release centers, toiletries were provided to them at no charge.
The department has promulgated a number of other regulations authorizing certain charges at issue in this case. Pursuant to Admin. Reg. No. 601, the department is authorized to charge an inmate a $3 co-pay for “self-initiated” medical visits. If the visit is initiated by medical staff, a physician referral, the warden, or another prison official, the inmate is not charged the co-pay. The regulation also specifies that under no circumstances would an inmate be denied access to health care because of an inability to pay the co-pay. Allen said that the purpose of the co-pay is to discourage malingering among inmates.
Pursuant to Admin. Reg. No. 440, § V.F.3., the department is authorized to charge an inmate the cost of a urine drug test performed by an independent laboratory to confirm a positive test for illegal drugs. At the time of trial, that cost was $31.50. If the results of the independent test were negative for illegal substances, the inmate was not charged the fee. Admin. Reg. No. 440, § V.E.5.
*8 After a hearing, the trial court entered a judgment approving the practice of charging work-release inmates the co-pay for “self-initiated” medical care, approving the drug-testing fee charged to inmates when a drug test is administered to confirm the results of a previous drug test indicating that the inmate has tested positive for use of an illegal substance, and approving the laundry fee.
On the other hand, the trial court found that the department had failed to amend its regulations, as required by the regulations themselves, and that the department’s “informal” amendment of the regulations was invalid. Therefore, the trial court held, DOC did not have the authority to withhold more than 32.5% of a work-release inmate’s earnings to defray the costs of incarceration or to increase the charges an inmate pays for transportation costs from $2 to $2.50 for one-way trips and from $4 to $5 for round trips to the inmate’s place of employment. The trial court enjoined DOC from withholding 40% of an inmate’s work-release earnings or from charging inmates more for transportation than the amount stipulated in Admin. Reg. No. 410, § VILB. However, the trial court stayed its injunction for 180 days to allow the department to formally amended its regulations to bring them in line with current practices.
Because the trial court found that, under the terms of the department’s current regulations, DOC was allowed to withhold only 32.5% of an inmate’s work-release earnings, the issue whether DOC, by charging fees for certain goods and services in addition to withholding funds from an inmate’s work-release earnings, was exceeding the 40% cap under § 14-8-6 was moot. However, the court went on to “hold” that, in amending § 14-8-6, the Legislature intended “to place an absolute cap on the monies [DOC] could take from inmates: ‘In no event shall the withheld earnings exceed 40% of the earnings of the inmates.’ (emphasis added).” The trial court stated: “Once the 40 percent threshold is reached, [DOC] is prohibited by statute from taking any more money, whether it is for costs of confinement, costs of work release, or any other fee or expense.”
The trial court further held that § 14-8-6 authorized the department to withhold a percentage of a work-release inmate’s earnings “actually deposited in the institution by the employer” and not a percentage of an inmate’s gross income. Therefore, the trial court held, the department had misinterpreted the statute when it promulgated Admin. Reg. No. 410, § VII.B., which allows the department to withhold 32.5% of a work-release inmate’s gross earnings.
The trial court noted that the parties had agreed to resolve liability issues before presenting evidence on damages or class certification. Because the amount of damages relating to the issues of transportation costs and income withholding had yet to be determined, the trial court certified its judgment on the issue of liability as final pursuant to Rule 54(b), Ala. R. Civ. P. DOC appeals; the plaintiffs cross-appeal.

Propriety of the Rule 5k(b) certification

We begin by addressing the effectiveness of the trial court’s certification of finality of the judgment even though the issue of damages has not yet been adjudicated.
“ ‘ “[F]or a Rule 54(b) certification of finality to be effective, it must fully adjudicate at least one claim or fully dispose of the claims as they relate to at least one party.” Haynes v. Alfa Fin. Corp., 730 So.2d 178, 181 (Ala.1999).
“ ‘ “If an order does not completely dispose of or fully adjudicate at least *9 one claim, a court’s Rule 54(b) certification of the order is not effective. See Haynes v. Alfa Fin. Corp., 730 So.2d 178 (Ala.1999). Damages are only one portion of a claim to vindicate a legal right, even though the damages claimed may consist of several elements. See id. at 181. An order is not final if it permits a party to return to court and prove more damages or if it leaves open the question of additional recovery. See Precision American Corp. v. Leasing Serv. Corp., 505 So.2d 380, 382 (Ala.1987).”
“ ‘Grantham v. Vanderzyl, 802 So.2d 1077, 1080 (Ala.2001).
“ ‘ “To be sure, the trial court recited the formula for certification of a judgment pursuant to Rule 54(b), Ala. R. Civ. P. However, ‘[n]ot every order has the requisite element of finality that can trigger the operation of Rule 51(b).’ Goldome Credit Corp. v. Player, 869 So.2d 1146, 1147 (Ala.Civ.App.2003) (emphasis added). A claim is not eligible for Rule 54(b) certification unless it has been completely resolved by the judgment. In that regard, it must be remembered that ‘[djamages are [an element] of a claim to vindicate a legal right.’ Grantham v. Vanderzyl, 802 So.2d 1077, 1080 (Ala.2001).
“ ‘ “ “Where the amount of damages is an issue, ... the recognized rule of law in Alabama is that no appeal will lie from a judgment which does not adjudicate that issue by ascertainment of the amount of those damages.’ Moody v. State ex rel. Payne, 351 So.2d 547, 551 (Ala.1977). ‘That a judgment is not final when the amount of damages has not been fixed by it is unquestionable.’ ‘Automatic’ Sprinkler Corp. of America v. B.F. Goodrich Co., 351 So.2d 555, 557 (Ala.1977) (recitation of the Rule 54(b) formula was ineffective to render appealable a judgment that resolved liability, but reserved the issue of damages for future resolution). ‘[T]he trial court cannot confer appellate jurisdiction upon this [C]ourt through directing entry of judgment under Rule 54(b) if the judgment is not otherwise “final.” ’ Robinson v. Computer Servicenters, Inc., 360 So.2d 299, 302 (Ala.1978). Thus, it is well-established that a claim for which damages are sought is insufficiently adjudicated for Rule 54(b) purposes until the element of damages is resolved; a judgment resolving only liability in an action seeking damages cannot be certified as final pursuant to Rule 54(b). Tanner v. Alabama Power Co., 617 So.2d 656 (Ala.1993).
“ ‘ “That this case suffers from this defect is self-evident. The trial court purported to certify for appellate review the default judgment of 35 counterclaims, 29 of which sought damages that are yet to be determined. Because the trial court’s order was ineffective to confer appellate jurisdiction over those counterclaims, the judgment, as it relates to the 29 counterclaims seeking damages, is nonfinal and nonreviewable at this time.”
“ ‘Dzwonkowski v. Sonitrol of Mobile, Inc., 892 So.2d 354, 361-62 (Ala.2004).’ ”
Martin v. Phillips, 7 So.3d 1012, 1018-19 (Ala.Civ.App.2008) (quoting Certain Underwriters at Lloyd’s, London v. Southern Natural Gas Co., 939 So.2d 21, 28-29 (Ala.2006)).
DOC argues that, although the amount of damages has not yet been determined on the issues of its collection of transportation costs and its withholding of inmates’ work-release earnings in excess of the *10 amount provided in the department’s regulations, the judgment is final as to those issues, as well as to the issues resolved in favor of DOC and for which no damages are pending, because, it says, any claim by the plaintiffs for a refund is barred by sovereign immunity.
The plaintiffs counter with the argument that immunity under Art. I, § 14, Ala. Const.1901, does not apply to actions for damages brought against State officials sued individually when it has been alleged, as in this case, that the officials acted fraudulently, in bad faith, beyond them authority, or in a mistaken interpretation of law. They point out that in the judgment the trial court held that the individual defendants, who were sued both in their official capacities and individually, acted under a mistaken interpretation of law.
Section 14 of the Alabama Constitution of 1901 provides that “the State of Alabama shall never be made a defendant in any court of law or equity.” The absolute immunity afforded by Section 14 extends to both the State and State agencies. Ex parte Alabama Dep’t of Human Res., 999 So.2d 891, 895 (Ala.2008); Ex parte Jackson County Bd. of Educ., 4 So.3d 1099, 1102 (Ala.2008); and Ex parte Alabama Dep’t of Transp., 764 So.2d 1263, 1268 (Ala.2000).
“What we have come to refer to as ‘State immunity’ or ‘absolute immunity’ bars claims, among other things, for monetary damages against: the State, a State agency, and a State official or employee sued in his or her official capacity as an agent of the State. See [Ex parte] Davis, 930 So.2d [497] at 500 [(Ala.2005)]. State immunity also may bar an action against certain State officials sued in their individual capacity. See Phillips v. Thomas, 555 So.2d 81, 83 (Ala.1989).
“ ‘Whether immunity serves as a defense to an action against a state officer or employee sued in his individual capacity depends upon the degree to which the action involves a State interest. “Our cases adhere to the view that the State has an interest such as will prohibit suit against the State official or employee where the action is, in effect, against the State.” Taylor v. Troy State Univ., 437 So.2d 472, 474 (Ala.1983).
“ ‘When determining whether a State interest in an action against a state official or employee in his or her individual capacity is sufficient to trigger the immunity granted by § 14, our cases distinguish between the standards applied to those state agents or employees whose positions exist by virtue of legislative pronouncement and those who serve as the constitutional officers of this State. We have held that State-agent immunity may bar an action against a state agent or employee under the principles announced in Ex parte Cranman, 792 So.2d 392 (Ala.2000). See Ex parte Butts, 775 So.2d 173 (Ala.2000) (adopting, by majority, the Cranman restatement of the rule governing State-agent immunity). However, this Court has consistently held that a claim for monetary damages made against a constitutional officer in the officer’s individual capacity is barred by State immunity whenever the acts that are the basis of the alleged liability were performed within the course and scope of the officer’s employment. See, e.g., Boshell v. Walker County Sheriff, 598 So.2d 843, 844 (Ala.1992) (“a sheriff, as an executive officer of the State of Alabama, is immune, under Article I, § 14, of the Alabama Constitution, from suit based *11 on state law claims arising out of the execution of the duties of his office”).’
“Davis, 930 So.2d at 500-01 (emphasis added).”
Ex parte Lawley, 38 So.3d 41, 46-7 (Ala.2009).
The plaintiffs correctly point out that certain causes of action are not barred by Section 14, including actions for an injunction or damages brought against State officials in their representative capacities and individually when, for example, it is alleged that the State officials acted fraudulently, in bad faith, beyond their authority, or in a mistaken interpretation of law. Alabama Dep’t of Transp. v. Harbert Int’l, Inc., 990 So.2d 831, 840 (Ala.2008); Drummond Co. v. Alabama Dep’t of Transp., 937 So.2d 56, 58 (Ala.2006).
“This Court has qualified those ‘exceptions,’ noting that ‘ “[a]n action is one against the [S]tate when a favorable result for the plaintiff would directly affect a contract or property right of the State, or would result in the plaintiffs recovery of money from the [S]tate.” ’ Alabama Agric. & Mech. Univ. v. Jones, 895 So.2d 867, 873 (Ala.2004) (quoting Shoals Cmty. Coll. v. Colagross, 674 So.2d 1311, 1314 (Ala.Civ.App.1995)) (emphasis added in Jones).”
Alabama Dep’t of Transp., 990 So.2d at 840.
The question we must answer, therefore, is whether the plaintiffs’ claims for refunds in this case based upon the improper collection of certain money from work-release inmates because of the individual defendants’ mistaken interpretations of law are essentially claims against the State seeking money damages.
“Generally, mandamus relief is available in certain situations to compel a State officer to perform the ministerial act of tendering payment of liquidated or certain sums the State is legally obligated to pay under a contract. State Highway Dep’t v. Milton Constr. Co., 586 So.2d 872, 875 (Ala.1991); see also [Alabama Agric. & Mech. Univ. v.] Jones, 895 So.2d [867] at 877-79 [ (Ala.2004) ] (describing as ‘well-established [the] rule that a writ of mandamus will issue to compel payment of only such claims as are liquidated’ and noting that prior caselaw had held ‘that payment for goods or services, for which the State had contracted and accepted, could be compelled by mandamus’); and State Bd. of Admin. v. Roquemore, 218 Ala. 120, 124, 117 So. 757, 760 (1928) (‘the claim asserted [against the State was] for an amount fixed or determinable by the terms of the contract of sale,’ and was ‘definite and certain, ... and not an unliquidated claim, in the sense that would render mandamus unavailable’).”
Alabama Dep’t of Transp., 990 So.2d at 842. However, suits to recover damages from the State that do not seek to compel payment of money the State is legally obligated to pay pursuant to a contract are generally barred. For example,
“[i]n Stark v. Troy State University, 514 So.2d 46 (Ala.1987), the plaintiff, an employee of a State university, sued certain State officers employed by the university, arguing that they had violated the university’s policies in underpaying him during a prior academic year. He thus sought damages for back pay. The defendants argued that the action was barred by § 14. [Our supreme court] stated:
“ ‘Based on the foregoing, if the individual defendants have not acted toward the plaintiff in accordance with the rules and regulations set by the university, their acts are arbitrary and an action seeking to compel them *12 to perform, their legal duties will not be barred by the sovereign immunity clause of the Alabama Constitution of 1901; however, the action for compensatory damages cannot be maintained. The reason was stated in Gunter v. Beasley, 414 So.2d 41 (Ala.1982):
“ ‘ “Section 14 prohibits the State from being made a defendant in any court of this state and neither the State nor any individual can consent to a suit against the State. Aland v. Graham, 287 Ala. 226, 250 So.2d 677 (1971). The application of Section 14 to suits against officers of the State was treated in Ex parte Carter, 395 So.2d 65 (Ala.1980), as follows:
In determining whether an action against a state officer is barred by § 14, the Court considers the nature of the suit or the relief demanded, not the character of the office of the person against whom the suit is brought. Wallace v. Board of Education of Montgomery County, 280 Ala. 635, 197 So.2d 428 (1967). This Court has held that § lí prohibits suit against State officers and agents in their official capacity or individually when a result favorable to the plaintiff would directly affect a contract or property right of the State. Southall v. Stricos Corp., 275 Ala. 156, 153 So.2d 234 (1963).’ ” (Emphasis added.)
“ ‘414 So.2d at 48.’
“514 So.2d at 50-51.”
Alabama Dep’t of Transp., 990 So.2d at 844-45.
In Ex parte Carlisle, 894 So.2d 721, 726 (Ala.Civ.App.2004), this court held that a taxpayer’s lawsuit seeking a tax refund through a class-action complaint for a declaratory judgment and a petition for a refund of taxes was barred by Section 14 because payment of the refund would affect the financial status of the State treasury. This court provided the following basis for its holding:
“ ‘A direct action for a refund of taxes paid to the State is essentially “a common law action of indebitatus assumpsit against the State.” J.R. Raible Co. v. State Tax Comm’n, 239 Ala. 41, 44, 194 So. 560, 561 (1939). Clearly, a judgment in favor of the class, which seeks tax refunds ... would “affect the financial status of the state treasury.” State Docks Comm’n v. Barnes, 225 Ala. [403] at 405, 143 So. [581] at 582 [(1932)] (emphasis added). See also Williams v. Hank’s Ambulance Serv., Inc., 699 So.2d 1230, 1232 (Ala.1997) (a judgment in favor of medical providers requiring reimbursement from the State for services, which payment had been withheld under the State’s erroneous interpretation of federal statutes, would “ ‘directly affect a ... property right of the State,’ ” and, therefore, was barred by § 14); Ex parte Sizemore, 611 So.2d 1069, 1070 (Ala.1993) (an action seeking a refund of income taxes paid on military retirement benefits was an unconstitutional “action against the state, seeking as a remedy funds from the state treasury”)(Houston, J., dissenting from quashing the writ of certiora-ri).’ ”
Carlisle, 894 So.2d at 726 (quoting Patterson v. Gladwin Corp., 835 So.2d 137, 143 (Ala.2002)).
In this case, as in Stark v. Troy State University, 514 So.2d 46 (Ala.1987), the plaintiffs’ action alleging that the individual defendants improperly overcharged them for transportation costs or withheld *13 more money than was authorized from their work-release earnings based upon misinterpretations of law cannot be barred by the sovereign-immunity clause of the Alabama Constitution of 1901. However, on the authority of Stark and Carlisle, supra, we hold that because a judgment awarding refunds of the improperly collected money would affect the financial status of the State treasury, the action for refunds cannot be maintained. Because the plaintiffs cannot recover damages in this action, the judgment was properly certified as final and, therefore, is reviewable by this court.

DOC’s appeal

DOC argues first that the claims asserted against the department by plaintiff Robinson are barred by the application of sovereign immunity under § 14, Ala. Const.1901. Robinson named only the department in his complaint. Alabama law is clear — a suit against a State agency like the department is barred by § 14. Alabama Dep’t of Corr. v. Montgomery County Comm’n, 11 So.3d 189, 191 (Ala.2008).
“Section 14, Ala. Const.1901, provides: ‘[T]he State of Alabama shall never be made a defendant in any court of law or equity.’ (Emphasis added.) ‘The wall of immunity erected by § 14 is nearly impregnable.’ Patterson v. Gladwin Corp., 835 So.2d 137, 142 (Ala.2002). Indeed, as regards the State of Alabama and its agencies, the wall is absolutely impregnable. Ex parte Alabama Dep’t of Human Res., 999 So.2d 891, 895 (Ala.2008) (‘Section 14 affords absolute immunity to both the State and State agencies.’); Ex parte Jackson County Bd. of Educ., 4 So.3d 1099, 1102 (Ala.2008) (same); Atkinson v. State, 986 So.2d 408, 410-11 (Ala.2007) (same); [Ex parte Alabama Department of Transportation (In re Good Hope Contracting Co. v. Alabama Department of Transportation ), 978 So.2d 17 (Ala.2007)] (same); Ex parte Alabama Dep’t of Transp., 764 So.2d 1263, 1268 (Ala.2000) (same); Mitchell v. Davis, 598 So.2d 801, 806 (Ala.1992) (same). ‘Absolute immunity’ means just that — the State and its agencies are not subject to suit under any theory.”
Alabama Dep’t of Corr., 11 So.3d at 191. Robinson’s failure to name any other defendant in his complaint deprived the trial court of subject-matter jurisdiction over the complaint from the time of its filing. Ex parte Alabama Dep’t of Transp., 6 So.3d 1126, 1128 (Ala.2008) (holding that a complaint naming a State agency did not invoke the subject-matter jurisdiction of the trial court and that, therefore, the trial court also lacked jurisdiction to entertain an amendment to the original complaint). Thus, Robinson’s complaint could not be revived by consolidation of Robinson’s action with the other actions; we dismiss DOC’s appeal insofar as it purports to be from a judgment entered in favor of plaintiff Robinson on his claims against the department, and we instruct the trial court to dismiss Robinson’s complaint for lack of subject-matter jurisdiction.
DOC also argues that all the plaintiffs except plaintiff Williams lack standing to seek an injunction requiring DOC to comply with the department’s regulations because, other than Williams, the plaintiffs are no longer in the work-release program.
“Whether a party has standing ‘turns on “whether the party has been injured in fact and whether the injury is to a legally protected right ” ’ so as ‘ “to ensure that he will vigorously present his case.” ’ State v. Property at 2018 Rainbow Drive, 740 So.2d 1025, 1027-28 (Ala.1999). This Court has said that a party *14 has standing where, among other things, there is ‘an actual, concrete and particularized “injury in fact” — “an invasion of a legally protected interest.” ’ Alabama Alcoholic Beverage Control Bd. v. Henri-Duval Winery, LLC, 890 So.2d 70, 74 (Ala.2003) (relied upon in Town of Cedar Bluff v. Citizens Caring for Children, 904 So.2d 1253 (Ala.2004)).”
Working v. Jefferson County Election Comm’n, 2 So.3d 827, 832 (Ala.2008). DOC argues that the plaintiffs who are not currently participating in the work-release program are not suffering an actual injury to any legally protected right because they no longer have any legally protected interest in the administration of the work-release program.
However, although the application and construction of Ala.Code 1975, § 14-8-6, which relates to the department’s authority to withhold moneys from an inmate’s work-release earnings, is central to this appeal, the plaintiffs also challenge the assessment of other charges against all inmates, specifically the drug-test fee and the self-initiated medical “co-pay.” Because all the remaining plaintiffs have been and may continue to be subjected to those fees, they have, and may continue to, suffer an injury to a legally protected interest. Thus, all the remaining plaintiffs have standing to challenge those fees, even though, with the exception of Williams, they are not currently participants in a work-release program.
DOC contends that the trial court erred in granting injunctive relief to the plaintiffs, enjoining DOC from withholding more than 32.5% of a work-release inmate’s earnings to defray costs of incarceration and from charging work-release inmates more for transportation costs than the amount stipulated in Admin. Reg. No. 401, § VII.B. The basis for the trial court’s injunction was that the collection of money from inmates’ work-release earnings was not in compliance with the provisions of Admin. Reg. No. 401. However, since the entry of the trial court’s judgment, the department has formally amended that regulation so that it is now authorized to collect the increased transportation costs and to withhold up to 40% of an inmate’s work-release earnings. The amendment of the regulation renders this issue moot. “A case is moot when there is no real controversy and it seeks to determine an abstract question which does not rest on existing facts or rights. Postal Telegraph-Cable Co. v. City of Montgomery, 193 Ala. 234, 69 So. 428 (1915); American Federation of State, County and Municipal Employees v. Dawkins, 268 Ala. 13, 104 So.2d 827 (1958).” Underwood v. Alabama State Bd. of Educ., 39 So.3d 120, 129 (Ala.2009). Accordingly, we will not consider this issue.
DOC contends that the trial court erred in holding that § 14-8-6, Ala.Code 1975, precludes DOC from charging a work-release inmate transportation costs or other employment-related charges once it has withheld 40% of an inmate’s work-release earnings. DOC also asserts that the trial court erred in holding that § 14-8-6 allows up to 40% of an inmate’s net earnings to be withheld, rather than up to 40% of an inmate’s gross earnings.
Section 14-8-6 provides as follows:
“The employer of an inmate involved in work release shall pay the inmate’s wages directly to the Department of Corrections. The department may adopt regulations concerning the disbursement of any earnings of the inmates involved in work release. The department is authorized to withhold from an inmate’s earnings the cost incident to the inmate’s confinement as the department shall deem appropriate and reasonable. In no event shall the with *15 held earnings exceed 40 percent of the earnings of the inmate. After all expenses have been deducted by the department, the remainder of the inmate’s earnings shall be credited to his or her account with the department. Upon his or her release all moneys being held by the department shall be paid over to the inmate.”
Our inquiry is governed by settled principles of statutory construction:
“ ‘ “ ‘The fundamental rule of statutory construction is that this Court is to ascertain and effectuate the legislative intent as expressed in the statute. League of Women Voters v. Renfro, 292 Ala. 128, 290 So.2d 167 (1974). In this ascertainment, we must look to the entire Act instead of isolated phrases or clauses; Opinion of the Justices, 264 Ala. 176, 85 So.2d 391 (1956).’ ” ’
“Bright v. Calhoun, 988 So.2d 492, 497 (Ala.2008) (quoting City of Bessemer v. McClain, 957 So.2d 1061, 1074-75 (Ala.2006), quoting in turn Darks Dairy, Inc. v. Alabama Dairy Comm’n, 367 So.2d 1378, 1380 (Ala.1979) (emphasis omitted)).
“To determine legislative intent, the Court must first look to the language of the statute. If, giving the statutory language its plain and ordinary meaning, we conclude that the language is unambiguous, then there is no room for judicial construction. Ex parte Waddail, 827 So.2d 789, 794 (Ala.2001).”
Fluker v. Wolff, 46 So.3d 942, 953 (Ala.2010). In addition, “ ‘ “[t]here is a presumption that every word, sentence, or provision was intended for some useful purpose, has some force and effect, and that some effect is to be given to each, and also that no superfluous words or provisions were used.” ’ ” Ex parte Uniroyal Tire Co., 779 So.2d 227, 236 (Ala.2000) (quoting Sheffield v. State, 708 So.2d 899, 909 (Ala.Crim.App.1997) (quoting in turn 82 C.J.S. Statutes § 316 at p. 551-52 (1953))).
“[I]n interpreting a statute, a court accepts an administrative interpretation of the statute by the agency charged with its administration, if that interpretation is reasonable.... Absent a compelling reason not to do so, a court will give great weight to an agency’s interpretations of a statute and will consider them persuasive.”
State v. Pettaway, 794 So.2d 1153, 1157 (Ala.Civ.App.2001) (emphasis added).
DOC argues that, from the plain language of the statute, the 40% cap applies only to the costs of confinement. It asserts that nothing in the statute prohibits it from collecting those fees and costs an inmate may incur for employment-related purposes, such as transportation costs to and from their place of employment, which DOC argues are not costs of confinement. We disagree.
In capping at 40% the amount DOC may withhold from a work-release inmate’s earnings “whether it is for costs of confinement, costs of work release, or any other fee or expense,” the trial court reasoned as follows:
“[DOC’s] interpretation would allow it to take 100 percent of an inmate’s earnings if [DOC] could attribute an expense to something other than a cost of confinement. Costs of work release ([DOC’s] term used to avoid § 14-8-6) could hypothetically include the cost of guards assigned to work release, personnel to handle the paperwork for work release, and bookkeepers who account for the money received. The exceptions would swallow the rule.”
Section 14-8-6 is contained in the chapter of the Alabama Code authorizing the *16 department to institute work-release programs for State inmates. That section authorizes DOC “to withhold from an inmate’s earnings the cost incident to the inmate’s confinement as [DOC] shall deem appropriate and reasonable.” § 14-8-6. The statute specifically limits DOC’s power to withhold moneys from the inmate’s earnings: “In no event shall the withheld earnings exceed 40 percent of the earnings of the inmate.” Id.
DOC argues that the laundry fees and transportation fees it imposes on work-release inmates are not costs of confinement but, instead, are costs related to work release. However, although work-release inmates are not technically confined within an institution during the period that they are engaged in their work-release employment, a conclusion that costs associated with their work-release employment are not incident to their confinement does not follow. See Crowe v. State ex rel. Patterson, 860 So.2d 363, 366 (Ala.Civ.App.2003) (quoting Cagle v. State, 611 So.2d 1199, 1201 (Ala.Crim.App.1992)) (“ ‘[W]ork release is a form of custodial confinement,’ ” and “ ‘[s]erving on work release is serving the sentence to confinement.’ ”). The word “incident” is defined as “dependent on or relating to another thing in law.” Merriam-Webster’s Collegiate Dictionary 629 (11th ed.2003). Thus, costs that are dependent on the fact that the work-release inmate is still, in actuality, confined in a penal institution, despite his or her temporary release for employment purposes pursuant to § 14-8-2, would be costs “incident” to the inmate’s confinement.
Without question, § 14-8-6 provides that DOC is permitted to withhold the costs incident to a work-release inmate’s confinement from the inmate’s earnings. However, the ability to withhold a portion of a work-release inmate’s earnings is restricted by a 40% cap on the amount that may be withheld. The way that DOC would have us construe the phrase “costs incident to the inmate’s confinement” would render the 40% cap meaningless. Under DOC’s interpretation, all DOC would have to do is to classify whatever cost it desires to deduct as something other than a “cost incident to the inmate’s confinement.” For example, DOC might classify a particular cost as a “cost incident to work release” or a cost of transportation. If the cost is not “incident to the inmate’s confinement,” concludes DOC, there is no limit on DOC’s power to deduct the money from a work-release inmate’s earnings. This would allow DOC’s exception to swallow the rule and would render the cap instituted by the Legislature meaningless, something that this court should be loathe to do in light of the principle of statutory construction that requires us to give “ ‘ “every word, sentence, or provision ... some force and effect.” ’ ” Ex parte Uniroyal Tire Co., 779 So.2d at 236. Section 14-8-6 provides that “[i]n no event shall the withheld earnings exceed 40 percent of the earnings of the inmate.” Thus, we conclude that DOC may not withhold more than 40% of a work-release inmate’s wages.
On application for rehearing, DOC asserts that our interpretation of § 14-8-6 would prevent DOC from collecting and paying restitution, child support, and other similar charges from the income received by inmates through the work-release program. We disagree. Section 14-8-6 plainly authorizes DOC to withhold up to 40% of the wages an inmate earns in work release in order to defray the “costs incident to the inmate’s confinement” that are incurred, in the first instance, by DOC. The 40% cap in § 14-8-6 obviously applies only to the moneys DOC can withhold from inmates’ work-release earnings for *17 the direct benefit of DOC. No language in § 14-8-6 limits, in any way, the authority of DOC to collect and pay moneys owed by an inmate to third parties, such as victims of the inmate’s crime or children of the inmate, from income earned by the inmate from work-release employment. Assuming DOC acts in accordance with a valid court order or pursuant to statutory law and the department’s internal regulations regarding disbursements from work-release earnings, DOC can lawfully pay a third party from work-release earnings even if making such payments in addition to other valid withholdings, would exceed 40% of those earnings. DOC simply cannot retain any part of the earnings exceeding 40% for its own benefit.
DOC also argues that the contracts signed by work-release participants authorize DOC to deduct laundry fees for free-world clothing, transportation fees, and the cost of toiletries from work-release inmates’ earnings. Thus, DOC argues that Williams’s claim regarding the unlawfulness of those fees is barred by his contractual agreement to allow deduction of those fees. Williams argues, however, that the work-release contracts are either illegal, because they directly contravene § 14-8-6, or that they are void because they are contracts of adhesion.
Williams relies on the principle that “ ‘ “[w]hen both parties, acting under a mistake of law, make a contract which the law forbids, then the principals are not liable thereunder.... It is a mistake of law, known in law, yet probably unknown in fact, to the parties to the contract at the time of its execution.” ’ ” Lucky Jacks Entm’t Ctr., LLC v. Jopat Bldg. Corp., 32 So.3d 565, 569 (Ala.2009) (quoting Walker v. Southern Trucking Corp., 283 Ala. 551, 553-54, 219 So.2d 379, 381 (1969), quoting in turn Wilson v. McKleroy, 206 Ala. 342, 348, 89 So. 584, 588-89 (1921), overruled on other grounds by Cross v. Rudder, 380 So.2d 766 (Ala.1979)). Notably, this principle has application even when the meaning of a statute has not yet been pronounced by a court. Lucky Jacks Entm’t Ctr., 32 So.3d at 569 (“However, this Court long ago explained that such circumstance — the resolution of a question of first impression as to the meaning of a statute — does not excuse the parties from compliance with the statute so as to render void contracts enforceable.”). Our supreme court explained the application of the principle that a mutual mistake of law renders a contract in violation of that law void even if the statute in question has yet to be interpreted thusly: “ ‘The statutes on this subject were then as fully promulgated as now. Every one was required to know their proper construction, and neither ignorance nor doubt was any excuse. — Ignorantia facti excusat; ignorantia juris non excusat.’” Id. at 570 (quoting Prince v. Prince, 67 Ala. 565, 569 (1880)). We therefore agree with Williams that the work-release contracts, which conflict with § 14-8-6 by allowing the deduction of certain expenses regardless of the 40% cap, are void and that DOC’s reliance on those contracts to escape the application of the 40% cap in § 14-8-6 is misplaced.
DOC further contends that the trial court erred in holding that the 40% withholding cap applies to a work-release inmate’s net earnings, not his gross earnings. The Alabama Code does not define “earnings” as that term is used in § 14-8-6. Statutes concerning county and municipal work-release inmates’ earnings specifically authorize the withholding of a percentage of the inmates’ gross earnings to defray the costs of confinement. § 14-8-37, Ala.Code 1975 (“Of each [county] inmate’s earnings, 25 percent of his gross wages shall be applied to the costs incident to the inmate’s confinement.” (emphasis *18 added)); and § 15-22-75, Ala.Code 1975 (“The mayor is authorized to withhold from a [municipal] inmate’s wages the costs incident to the inmate’s confinement as the mayor shall deem appropriate and reasonable, provided however, that in no event shall the mayor withhold more than 20 percent of such inmate’s gross wages as the costs incident to such inmate’s confinement.” (emphasis added)).
As previously mentioned,
“in interpreting a statute, a court accepts an administrative interpretation of the statute by the agency charged with its administration, if that interpretation is reasonable.... Absent a compelling reason not to do so, a court will give great weight to an agency’s interpretations of a statute and will consider them persuasive.”
Pettaway, 794 So.2d at 1157. Because the Legislature did not specify whether DOC was authorized to withhold 40% of a State inmate’s gross or net work-release earnings, it was logical for DOC to look to similar statutes for guidance. DOC’s interpretation of § 14-8-6 is reasonable, and we can find no compelling reason not to give great weight to that interpretation. Accordingly, we conclude that the trial court erred in holding that § 14-8-6 authorizes the withholding of 40% of a work-release inmate’s net earnings and not his or her gross earnings; therefore, we reverse the trial court’s judgment insofar as it held otherwise.

The plaintiffs’ cross-appeal

The plaintiffs’ cross-appeal, insofar as it relates to Robinson’s claims against the department, is dismissed for the same reasons DOC’s appeal, insofar as it relates to Robinson’s claims against the department, is dismissed.
Senate Bill 20, introduced in 1992, amended § 14-8-6 and increased the amount the department was authorized to withhold from a work-release inmate’s earnings from 32.5% to 40%. The plaintiffs contend that the bill is void because, they say, it was a revenue-generating measure that originated in the Alabama Senate and not the Alabama House of Representatives, where revenue measures are required to originate. Article IV, § 70, Ala. Const.1901.
It is well settled that the provision of § 70 at issue refers to bills that levy a tax as a means of collecting revenue. Sizemore v. Krupp Oil Co., 597 So.2d 211, 213 (Ala.Civ.App.1992); Yancey & Yancey Constr. Co. v. DeKalb County Comm’n, 361 So.2d 4 (Ala.1978); and Opinion of the Justices No. 131, 259 Ala. 514, 66 So.2d 921 (1953). However, “ ‘[w]hen an act has for its main purpose provision for the general welfare by enacting a scheme within the state’s police power, it is not one to raise revenue, though it does so as an incident to such scheme.’ Beeland Wholesale Co. v. Kaufman, 234 Ala. 249, 260, 174 So. 516, 525 (1937).” Sizemore, 597 So.2d at 213.
Our supreme court has determined that bills whose main purposes are to provide for the general welfare, but which also raise revenue incident to their schemes, are not required to originate in the House. Dearborn v. Johnson, 234 Ala. 84, 87, 173 So. 864 (1937).
“In Opinion of the Justices No. 13, 223 Ala. 369, 136 So. 589 (1931), the Chief Justice and Associate Justices opined that an act imposing a gasoline tax was not a ‘revenue bill.’ In reaching this conclusion, the Justices opined:
“ ‘The provision of section 70 of our Constitution, saying: “No revenue bill shall be passed during the last five days of the session,” was construed in Kennamer v. State, 150 Ala. 74, 43 So. 482 [(1907)]. That case involved the *19 provisions of a local road law levying a privilege tax on vehicles for the construction and maintenance of public roads.
“ ‘This levy was sustained upon the ground that the purpose was not simply to raise revenue, but to require those deriving a special benefit from the use of the roads, and imposing a special burden in the maintenance of same, to pay a reasonable sum for the privilege, the proceeds to be devoted to road purposes.
“ ‘The construction and maintenance of highways is referable to the police power of the state in promoting the public convenience and welfare.
“‘The Kennamer Case is authority for the view that legislation to that end, and not for revenue merely, is not a “revenue bill” within the quoted clause of section 70.
“‘An excise tax on motor fuels is levied for like reasons as the vehicle tax considered in the Kennamer Case; namely, special burdens for special benefits.’
“223 Ala. at 370, 136 So. at 590. The Justices also stated in Opinion of the Justices No. 37, 232 Ala. 60, 166 So. 710 (1936):
“ ‘[W]hen the main purpose is as described in section 1 of the substitute for House Bill 180, referred to in your inquiry, it is clear that raising revenue is merely incidental to the purpose there defined. Kennamer v. State, 150 Ala. 74, 43 So. 482 [(1907)]; 54 Corpus Juris, 744.’
“232 Ala. at 62, 166 So. at 712.
“H.B. 713’s primary purpose is to provide for a disposition of the fees collected for returning polluted groundwater to a quality comparable to its previous state. The purpose of the act is not simply to raise revenue but to provide certain environmental protections regarding polluted groundwater. It is clear that raising revenue is merely incidental to the purpose defined in the act; therefore, based upon the law of this state, as expressed in opinions of this Court, we are of the opinion that H.B. 713 is not a ‘revenue bill’ and may, therefore, be passed during the last five days of the legislative session.”
Opinion of the Justices No. 324, 511 So.2d 505, 512-13 (Ala.1987).
The chief purpose of Senate Bill 20, which amended § 14-8-6 in 1992, was to require those who are incarcerated in the State’s penitentiaries, but who are earning money as part of the department’s work-release program, to pay a reasonable sum toward the costs of their incarceration, which is within the police power of the State. The statute requires those receiving housing, board, and the like to help shoulder the burden of those costs, i.e., “ ‘ “special burdens for special benefits.” ’ ” Id. at 512. Accordingly, the bill was not required to originate in the House. The plaintiffs’ argument to the contrary is without merit.
The plaintiffs contend that § 14-8-6 is unconstitutionally vague because it does not specify whether up to 40% of a work-release inmate’s net earnings or gross earnings are subject to withholding.[6] The cases on which the plaintiffs *20 rely in support of this argument address the constitutionality of criminal statutes prohibiting certain conduct or which may lead to arbitrary or discriminatory enforcement. They cite no authority, and our research has revealed no authority, for the proposition that an administrative statute, such as § 14-8-6, that is open to interpretation is unconstitutional. Indeed, the law is well settled that when an administrative statute is open to interpretation, the statute is not unconstitutional, but, in construing the meaning of a statute, interpretations of the statute by the administrative agency charged with the enforcement of said statute are to be accepted by a court absent a compelling reason not to do so. Alabama Dep’t of Revenue v. Jim Beam Brands Co., 11 So.3d 858, 866 (Ala.Civ.App.2008). Therefore, § 14-8-6, Ala. Code 1975, is not unconstitutionally vague.
The plaintiffs claim that laundry fees, transportation fees, the drug-testing fee, and the self-initiated medical co-pay are all imposed by DOC illegally. The plaintiffs first argue that the fees are not authorized by any statute and, thus, that the rules authorizing their collection are therefore invalid, because, they say, the department can enact only rules and regulations that are consistent with and are authorized by a statute. They further argue that any rules authorizing the imposition of the drug-testing fee and the medical co-pay are void because those rules were not properly enacted pursuant to § 41-22-4(b), Ala.Code 1975, a portion of the Alabama Administrative Procedure Act (“the AAPA”), codified at § 41-22-1 et seq., Ala. Code 1975. Finally, they argue that the imposition of the $31.50 drug-testing fee is an excessive fíne or an excessive punishment assessed in violation of Ala.Code 1975, § 14-3-52, and Art. I, § 15, Ala. Const.1901.
We begin our analysis by considering the power granted to the department in Ala.Code 1975, § 14-1-1.2, to “administer! ] and exercis[e] ... direct and effective control over penal and correctional institutions throughout this state.” The department is “headed by and under the independent direction, supervision and control of a Commissioner of Corrections.” Ala.Code 1975, § 14-1-1.3. The functions and duties of the department, according to Ala.Code 1975, § 14 — 1— 8(a)(6),[7] include “[t]o promulgate such rules and regulations necessary to hygiene, sanitation, cleanliness, healthfulness, feeding of prisoners, management and security of all prisons and jails.” Thus, the department, through the commissioner, has direct statutory authority to promulgate rules relating to, among other things, the management and security of correctional institutions.
The imposition of a medical copay designed to reduce malingering among inmates is a valid exercise of the power to promulgate rules relating to the management of correctional facilities by the commissioner. Similarly, the imposition of the drug-testing fee appears to be a valid exercise of the commissioner’s duty to promulgate rules to promote security in State penal institutions. We therefore cannot agree with the plaintiffs that the regulations regarding the medical co-pay and the *21 drug-testing fee were enacted without statutory authority.
The plaintiffs also argue that the regulations regarding the medical co-pay and the drug-testing fee are invalid because they were not enacted in compliance with § 41-22-4(b). Section 41-22-4(b) provides:
“No agency rule, order, or decision shall be valid or effective against any person or party nor may it be invoked by the agency for any purpose until it has been made available for public inspection and indexed as required by this section and the agency has given all notices required by Section 41-22-5.”
The plaintiffs argue in general that the regulations at issue were promulgated without the requisite notice to both inmates and the public. However, the promulgation of regulations relating to “[t]he conduct of inmates of public institutions” is specifically excepted from the definition of “rule,” see Ala.Code 1975, § 41-22-3(9)g.l., and, thus, the requirements of rule-making outlined in § 41-22-4(b) do not apply to the regulations at issue here.
Finally, we cannot agree with the plaintiffs that the assessment of the drug-testing fee is an excessive fine or a punishment assessed in violation of Art. I, § 15, or § 14-3-52. The fee has as its purpose defraying the cost of a second test to prove an inmate’s use of illegal drugs. An inmate is charged the fee only if the test confirms a positive result. The drug-testing regulation was promulgated to maintain security in State correctional facilities. The imposition of a fee for testing by an outside laboratory to confirm any positive test, which can form the basis of a custody-classification change or a disciplinary action against an inmate, serves the purpose of maintaining security by confirming if an inmate has violated §§ 13A-10-36 through -38, Ala.Code 1975, which define criminal offenses relating to the use or production of illegal substances inside a correctional facility. The drug-testing fee is not unauthorized by law. Because the plaintiffs make no argument that the amount of the drug-testing fee is excessive, we will not consider the argument further.
Regarding the laundry fees and the transportation fees, we reach the same conclusion. We have determined that such fees may be collected by DOC as costs of confinement. Section 14-8-6 permits the department to enact regulations concerning the disbursement of an inmate’s work-release earnings and also permits the department to “withhold from an inmate’s earnings the cost incident to the inmate’s confinement as the department shall deem appropriate and reasonable.” (Emphasis added.) Thus, we conclude that DOC may impose such fees for costs of confinement as it deems “appropriate and reasonable” and that it may deduct those fees up to an amount not exceeding 40% of the inmate’s work-release earnings. The regulation regarding the transportation fees, like the other regulations at issue here, is not void for failure to comply with the AAPA. See § 41 — 22—3(9)g.l.

Conclusion

For the reasons set forth above, we affirm the trial court’s judgment determining that the costs of work release are included within the costs of the confinement of an inmate, that § 14-8-6 precludes DOC from charging inmates for the costs inmates incur in connection with work release once the 40% cap on costs of confinement has been reached, and that DOC was authorized to charge certain fees and the medical co-pay; we reverse the judgment determining that DOC is authorized to withhold up to 40% of work-release inmates’ net earnings rather than their gross earnings. We dismiss the appeal *22 and the cross-appeal insofar as they purport to be from a judgment entered regarding plaintiff Robinson, and we instruct the trial court to dismiss Robinson’s complaint for lack of subject-matter jurisdiction.
APPLICATION FOR REHEARING OVERRULED; OPINION OF JUNE 18, 2010, WITHDRAWN; OPINION SUBSTITUTED; APPEAL — AFFIRMED IN PART; REVERSED IN PART; APPEAL DISMISSED IN PART; AND REMANDED. CROSS-APPEAL — AFFIRMED IN PART; APPEAL DISMISSED IN PART; AND REMANDED.
MOORE, J., concurs.
BRYAN and THOMAS, JJ., concur specially, with writings.
THOMPSON, P.J., concurs in part and dissents in part, with writing, which PITTMAN, J., joins.

. Mr. Carter's full name does not appear in the record on appeal.

. Mr. Reynolds's full name does not appear in the record on appeal.

.The plaintiffs filed four lawsuits that were consolidated for trial.

. Allen testified that he had no explanation as to why the original 1997 version of the regulation still referred to a maximum withholding of 32.5% when the statute had been amended five years earlier to allow a maximum withholding of 40%.

. Allen testified that inmates may choose to take public transportation to their places of employment, in which case the inmates are to pay the total cost of transportation. However, some of the plaintiffs testified that they were not given the option of taking public transportation to their places of employment.

. We recognize that in its judgment the trial court determined that the issue whether DOC was exceeding the 40% cap under § 14-8-6 was moot because, the trial court said, the regulation in place at the time, Admin. Reg. No. 410, authorized a withholding of 32.5%. However, the trial court went on to address the issue whether more than 40% of an inmate’s work-release earnings could be withheld. After the trial court entered its *20 judgment, the department formally amended Admin. Reg. No. 410 to authorize withholding of up to 40% of an inmate's work-release earnings. As a matter of judicial economy, we will address this issue.

. Although § 14 — 1—8(a) refers specifically to the “board” of corrections, in 1983 the enactment of Ala.Code 1975, § 14-1-1.1, created the department and vested in it all the duties and powers that once had belonged to the board.